IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| JAYNE C. CUBBAGE, | : | |
|---|---|---|
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | NO. 05-2989 |
| v. | : | |
| | : | |
| BLOOMBERG, L.P., | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

**Jones II, J.**                                                                              **August 31, 2010**

Before the Court is Defendant Bloomberg, L.P.'s Motion for Summary Judgment (Doc.

No. 53) and Plaintiff Jayne Cubbage's Response in Opposition thereto (Doc. No. 54).[1]  For the

reasons set forth below, Defendant's Motion will be GRANTED.

I.        **SUMMARY OF PROCEDURAL BACKGROUND**

On October 4, 2004, Plaintiff Jayne C. Cubbage filed a complaint with the Equal

Employment Opportunity Commission ("EEOC") and the New Jersey Department of Civil

Rights ("NJDCR") against her former employer, Bloomberg, L.P. ("Bloomberg").  She received

a right-to-sue letter from the EEOC dated March 22, 2005.  On June 22, 2005, she filed her

original Complaint against Bloomberg.  She subsequently amended her complaint two times.

Currently pending before this Court is Plaintiff's Second Amended Complaint, filed on May 5,

2008 (Dkt. No. 32).  In her Second Amended Complaint, Plaintiff asserts that Bloomberg

---

[1]Defendant's Motion and supporting Statement of Undisputed Facts, Memorandum of
Law, Affidavits, Declaration, Certificate of Service and Exhibits were all originally filed under
seal.  (Dkt. No. 53.)  However, Bloomberg has since notified the Court that it does not object to
the unsealing of its Motion, or to the Court's opinion being issued publicly.  (Dkt. No. 57.)

discriminated against her on the basis of her race, gender and disability. She brings claims

pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*,

and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* (Count I), as well

as the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1, *et seq.* (Count II);

Plaintiff also brings a claim for intentional infliction of emotional distress ("IIED") (Count III).[2]

On May 19, 2008, Defendant filed its Answer and Affirmative Defenses to the Second Amended

Complaint (Dkt. No. 33). While originally before the Honorable Gene E.K. Pratter, this case was

reassigned to my docket on November 17, 2008.

On March 2, 2009, Defendant filed its Motion for Summary Judgment ("Def. Mot."),

along with its Memorandum of Law in Support of its Motion ("Def. Mem.") and Statement of

Undisputed Facts ("Def. SOF") (collectively, Dkt. No. 53). Plaintiff filed her opposition ("Pl.

Opp."), including her Memorandum of Law in Opposition to Defendant's Motion ("Pl. Mem."),

her response to Defendant's Statement of Undisputed Facts ("Pl. SOF") and her own Statement

of Contested Facts ("Pl. SOCF") (collectively, Dkt. No. 54), on March 17, 2009. Pursuant to

Court Order, Defendant filed its response to Plaintiff's Statement of Contested Facts (Dkt. No.

59) ("Def. Opp. to Pl. SOCF") on April 9, 2010.

---

[2]In her opposition to Defendant's Motion for Summary Judgment, Plaintiff characterizes her Second Amended Complaint as alleging "unlawful discrimination/retaliation based on race, sex and/or disability." Plaintiff's Memorandum of Law in Opposition to Defendant's Motion (Dkt. No. 54) ("Pl. Mem.") at 3. However, nowhere does the Second Amended Complaint mention any retaliation claim, nor does Plaintiff raise this issue anywhere else in her briefing. As such, the Court will proceed to analyze Plaintiff's discrimination claims as pleaded, not any supposed allegations of retaliation.

## II.    FACTUAL ALLEGATIONS[3]

### A.    PLAINTIFF'S EMPLOYMENT WITH DEFENDANT

Plaintiff applied for at least two positions at Bloomberg in March 2000.  (Def. Mot., Ex. 4, Deposition of Jayne Cubbage ("Cubbage Dep.") 16-19; Def.'s Mot., Ex. 6, Employment Application of Jayne Cubbage, March 31, 2000 ("App."), Bloomberg L.P. Appendix ("BLP") 149-52.)  At that time, Plaintiff, an African-American female, had a bachelor's degree in journalism from Temple University, a master's degree in journalism from Columbia University, and was studying for a master's degree in liberal arts from the University of Pennsylvania.  (2d Am. Compl. ¶ 10; BLP 150.)  Carolynn Fedor, who managed the radio and television stations for Bloomberg, invited Plaintiff for an interview for a multimedia producer position in Bloomberg's Princeton, New Jersey office.  (Cubbage Dep. 19-20; Def.'s Mot., Ex. 5, Deposition of Carolynn Fedor ("Fedor Dep.") 7-8.)  Plaintiff interviewed with Fedor and members of Fedor's staff. (Cubbage Dep. 18-20, 23, 29-30.)  She later returned to the Princeton office for a second interview with Fedor and the head of news.  (*Id.* at 22.)  After the second interview, Fedor made the decision to hire Plaintiff, and Plaintiff was offered a multimedia producer position.  (*Id.* at 23; Fedor Dep. 10-11.)

Plaintiff began working as a multimedia producer on May 22, 2000.  (Cubbage Dep. 29; Def.'s Mot, Ex. 7, Scheirer Offer Letter to Cubbage, April 13, 2000 ("Offer Letter").)  Her direct supervisor was Jennifer Kushinka, who reported directly to Fedor.  (Fedor Dep. 7-9.) Her starting

---

[3]While Plaintiff asserts a number of "contested" facts, upon close examination the Court has determined that such disputes do not exist.  However, where Plaintiff has claimed that a particular material fact is indeed in genuine dispute, the Court will address such assertion in a footnote.  If the Court does not discuss a fact at all, it is because the Court has concluded that such fact is irrelevant or immaterial and thus not worthy of discussion.

salary was $55,000.00 plus six One-Year Equity Equivalency Certificates ("EECs") with a projected value of $674.00 each, for a total starting compensation of $59,044.00. (Cubbage Dep. 25-26, 30; Offer Letter.) At the time, Plaintiff was the only African-American producer in the multimedia department. (Cubbage Dep. 45).

Fedor was away on business during Plaintiff's first week of work. (*Id.* at 47.) When Fedor returned, Plaintiff felt she "showed a distance to" Plaintiff. (*Id.*) Plaintiff believed that Fedor's attitude and relationship with Plaintiff changed, as had the atmosphere at the company. (*Id.* at 48.) Plaintiff maintains that the shift she observed in Fedor was due to Plaintiff's change in hairstyle, from the straightened style she had worn during the interview to the natural unstraightened hairstyle she wore when she began working, although she cites no evidence in support of this belief. (*Id.* at 47-49.)

When Plaintiff asked to attend the National Association of Black Journalists ("NABJ") Convention to be held in July 2000, Fedor told her that she could not attend because she needed to focus on her development in the company and instead attend a financial market introduction course ("FMO") to learn the workings of the business world. (Id. at 50-51, 136-37.) Fedor told Plaintiff that the FMO course would assist Plaintiff in her position. (Id. at 137.) Other Bloomberg employees were allowed to attend the NABJ convention, but no one under Fedor's supervision was allowed to attend. (Id. at 51, 138.) When the FMO course ended in July 2000, Plaintiff received a failing grade in the course–a grade that was well below average. (Id. at 51.)

Later that month, Plaintiff attempted to leave the multimedia department. (Id. at 52.) Kushinka tried to help Plaintiff transfer, but Plaintiff learned that company policy required that she work at Bloomberg for a year before changing departments. (Id. at 52-53, 223.) Soon after

her attempt to transfer, Plaintiff was caught "surfing online" for another job and was sternly warned that she would be terminated immediately if caught doing so again. (*Id.* at 54.)[4] Soon after she was reprimanded for looking at an employment website, Plaintiff saw another Bloomberg employee, editor Jerry Laird, looking at a "nude silhouette" online on one occasion, but she did not report the incident to anyone. (*Id.* at 425, 430-31.)

Thereafter, Plaintiff's supervisors spoke to her repeatedly about her performance. (*Id.* at 54, 192-93.) In June or July 2000, Fedor and Kushinka began to call Plaintiff into meetings with a Human Resources ("HR") representative to discuss Plaintiff's poor performance. (*Id.* at 54, 95-98.) Plaintiff was called into five or six of these meetings at approximately six-month intervals during her three years at Bloomberg; however, Plaintiff acknowledges that Fedor and Kushinka truly believed they were assisting Plaintiff to improve her performance. (*Id.* at 41.)

Fedor also required Plaintiff to get permission directly from her when Plaintiff planned to travel to New York (*Id.* at 79-80), as she required any employee based in the Princeton office to offer an explanation to and seek permission from a manager to work out of the New York office. (Fedor Dep. 66-67.) Indeed, according to Plaintiff herself, Fedor had "properly surmised" that Plaintiff was looking for new jobs at Bloomberg while in New York. (Cubbage Dep. 127-28.)

When Plaintiff asked to change her schedule to complete a masters degree in liberal arts, she was informed that she required manager approval to schedule classes outside of work. (Def.'s Mot, Ex. 10, Managers Evaluation of Employee, November 2, 2000 ("November 2000

---

[4]Plaintiff alleges that other employees regularly surfed the internet and were never warned about this activity. (Cubbage Dep. 424.) However, Plaintiff offers no evidence of any similarly situated employee who was treated more leniently for a similar infraction.

Managers Evaluation") BLP 000069.)[5] Plaintiff ended up attending classes at night and finished her degree in May 2001. (Cubbage Dep. 134-35.)

Plaintiff's phone calls at the office were also monitored; Fedor admitted that she requested Plaintiff's phone records because "there were some questions as to phone calls that [Plaintiff] had been making from her desk while working," and it was "customary Bloomberg policy" to request phone records "to make sure that the phone was being used for work purposes." (Fedor Dep. 30-31.) However, Fedor could not recall another employee whose records she had requested. (*Id.*)

Although Plaintiff believed her performance was adequate, her supervisors remained dissatisfied. (Cubbage Dep. 37, 193.) They started working closely with her to improve her accuracy and began requiring that Plaintiff provide weekly reports about her progress. (Fedor Dep. 38-39.) On November 2, 2000, Plaintiff's managers completed an evaluation of Plaintiff. (November 2000 Managers Evaluation BLP 000065-69.)[6] In this evaluation, the managers listed no strengths in the areas of accuracy, energy, time management, questioning skills, and listening

---

[5]Plaintiff cites her March 2, 2001 performance report to demonstrate that she was prohibited from scheduling classes outside of work without her manager's approval but "other employees not in her class were allowed to have flexible work schedules." (Pl. SOCF) ¶ 6 (citing November 2000 Managers Evaluation BLP 000069).) The report states that Plaintiff "scheduled days to leave early for classes without clearing this first with an editor. While schedules can be flexible to some extent, it was made clear to [Plaintiff] that after her training is completed, she would not be able to schedule classes outside of work without approval of [a] manager." Plaintiff offers no evidence of any other employees being able to leave work early without first receiving permission.

[6]Bloomberg admits that the November 2000 Managers Evaluation lacks a signature or a place for a signature, and that Fedor did not recall this particular Evaluation. (Fedor Dep. 34-36.) Fedor testified that an employee's team leader would usually write the employee's review, but could not identify the author of this Evaluation. (*Id.*)

skills, and they noted numerous development needs in these and other areas. (*Id.*)

At the end of November 2000, Fedor and Kushinka felt they had tried enough to help Plaintiff understand her position, and ultimately removed Plaintiff from producing duties and assigned her to format transcripts full time. (Cubbage Dep. 165-68; Fedor Dep. 12-21; Def.'s Mot., Ex. 10, Managers Evaluation, January 2001 ("January 2001 Managers Evaluation") BLP000070-71.) Plaintiff considered this to be a mundane, menial and punishing assignment. (Cubbage Dep. 165, 167.)[7] One other person, an African-American woman named Michelle Peal, was also doing transcript work, and Plaintiff was assigned to work as a team with Peal. (*Id.* at 167-68.)[8]

Plaintiff's January 2001 Managers Evaluation noted that Plaintiff needed to improve the accuracy of her transcript work, noted positive teamwork, and listed several goals for improved accuracy and training. (January 2001 Managers Evaluation BLP000070-71.) On February 16, 2001, Plaintiff wrote to Fedor and listed some of the proactive steps she was taking to reach those goals. (Def. Mot., Ex. 10, Cubbage Email to Fedor, February 16, 2001 BLP000071-72.)

As of March 2, 2001, a performance report still noted numerous problems with Plaintiff's work quality, productivity, attendance, and work habits. (Def.'s Mot, Ex. 10, Performance Report, March 2, 2001 ("March 2001 Report") BLP000064-65.) The March 2001 Report noted that Plaintiff had "shown mediocre production quality and quantity," despite having a "huge

---

[7]Defendant asserts that editing transcripts is a normal part of the job of a producer. (Fedor Dep. 14-15; Cubbage Dep. 165-68.)

[8]Peal did not belong to the multimedia department at that time, but had worked in other roles under Fedor and by her own account was treated fairly by Fedor. (Affidavit of Michelle Peal, dated October 22, 2008 ("Peal Aff.") ¶¶ 2, 4, 8-9, 13, 16.)

reduction in workload and the far simpler job to accomplish" with her transcript assignment, and

stated that "[i]t's difficult to understand how she can produce so little during the day when taking

into account her educational and work background." (*Id.* at BLP000064.) The March 2001

Report also suggested that Plaintiff keep track of her daily accomplishments. (*Id.* at

BLP000065.)

That month, Kushinka and Fedor gave Plaintiff a written warning about her performance,

detailing several performance problems and stating that the problems had persisted despite

numerous counseling efforts. (Def.'s Mot., Ex. 9, Kushinka and Fedor Memorandum to

Cubbage, March 20, 2001 BLP 000056-57.) The written warning stated that immediate

substantial and sustained improvement was necessary to prevent further discipline, up to and

including termination. (*Id.*)

Two editors, Jerry Laird and Jim Houck, were particularly vocal critics of Plaintiff's

work. (Cubbage Dep. 54-55, 199.)[9] Houck would "harshly critique" Plaintiff's work, "invite

─────────────────────

[9]Plaintiff claims that Laird and Houck were more critical of her than they were of others, but admits that in fact she does not know how critical the editors were of the other producers' work. (Cubbage Dep. 57-60, 62.)

Chloe Beal, another editor in the multimedia department, testified that Stephen Cwito, a white male producer, was reassigned from covering financial news to sports news due to poor performance, but was not disparaged or demeaned as Plaintiff was. (Pl.'s Opp. to Def's Mot. for Summ. J. ("Pl.'s Opp."), Ex. 3, Dep. of Chloe Beal ("Beal Dep.") 16-17.) While Bloomberg contends that it does not have and has never had an employee named Stephen Cwito, the Court notes that Bloomberg appears only to have searched for said employee under this particular spelling of his name, as opposed to any possible alternative. (Def. Opp. to Pl. SOCF ¶ 22.) Regardless, for purposes of its summary judgment motion, Bloomberg "admits that Ms. Beal testified that a white male was performing poorly and was reassigned from covering financial news to sports news because of his poor performance." (*Id.*)

Beal also testified that "Lauren (LNU), a white female producer," suffered from an eating disorder that caused her to miss work and that Lauren "also made quite a few errors," but was not disparaged or demeaned as Plaintiff was. (Pl. SOCF ¶ 25 (citing Beal Dep. 19-20).) Bloomberg was unable to identify the employee to whom Beal referred as "Lauren." (Def. Opp. to Pl. SOCF

[her] over to his desk to stand there while he went through the elements of what was wrong in

[her] reports and do so in a harsh manner, and then sort of send [her] back to [her] desk to fix

whatever was–whatever the problem was." (*Id.* at 61.) Laird sat next to Plaintiff during her first

six months at Bloomberg; he would often walk by her without speaking and was "constantly

making...conservative, racist type remarks...just saying things off the cuff that were really

inappropriate." (*Id.* at 56, 199-201.)[10] Plaintiff testified to two particular comments Laird made

within her hearing:

> [Laird] was speaking one day off the cuff about a daughter of his who had...a young
> friend calling her. I believe he was alluding to the fact that the young boy was African
> American. He said something like, His name is Terrell...and then I took that to mean
> racist...[I] understand that typically that's a quote/unquote, African/American name.

(Cubbage Dep. 55.); and

> There was a person in Texas who was pending execution...[a]nd one of the premises of
> the case as to whether or not he should be executed was, is he, in fact, guilty. [Laid]
> would comment...whether he's guilty or not, he shouldn't have engaged in a lifestyle of
> crime...Those people ought to know better...They always get themselves into this kind of
> situation.

(*Id.* at 56.)[11]

---

¶ 25.)

    Bloomberg identifies only Fedor and Kushinka as Plaintiff's direct supervisors during her
tenure at the company; editors such as Laird and Houck reviewed Plaintiff's work but did not
have further supervisory responsibilities or authority. (Cubbage Dep. 30; Def. Opp. to Pl. SOCF
¶ 1.) Plaintiff did not report directly to the editors, the editors were not involved in her
performance reviews, and the editors did not have the ability to hire or fire Plaintiff. (Cubbage
Dep. 57-59; Def. Opp. to Pl. SOCF ¶ 1.)

    [10]When pressed for specifics regarding these alleged comments, Plaintiff stated: "I can't
give you specifics. I cannot." (Cubbage Dep. 58.)

    [11]Beal also heard Laird refer to another African-American female employee as a "bitch."
(Beal Dep. 16.) Beal assessed Laird's treatment of Plaintiff as "code for racial discrimination."
(Pl. SOCF ¶ 30 (citing Beal Dep. 13-14).) However, she was unable to recall any specific

Plaintiff spoke with Fedor about Laird's comments during a meeting about Plaintiff's performance. (*Id.* at 57, 194-95, 299-300.) According to Plaintiff, someone from HR was in the room when Plaintiff complained to Fedor about Laird. (*Id.* at 197.) Plaintiff does not recall if she related any specific comments that Laird had made, but she did say that she found Laird's comments offensive and intimidating. (*Id.* at 300-01.) According to Cubbage, Fedor responded that she liked Laird's contributions and that he brought a "special flavor" to the department. (*Id.* at 57, 194-95.) Fedor does not recall Plaintiff complaining about Laird. (Fedor Dep. 71-72.)

In her April 6, 2001 self-evaluation, Plaintiff wrote,

> My performance for the past 12 months has been marginal at best. I have struggled repeatedly to understand the requirements of multimedia. I have failed to understand how to incorporate my extensive journalism background into the producer position with multimedia. I have also not grasped important business concepts as quickly has [sic] I had hoped I would upon accepting my position in multimedia. Despite my steep learning curve, I have diligently attempted to improve my performance by meeting with editors and developing a personal strategy in multimedia based on such meetings and editor comments.

(Def.'s Mot., Ex. 8, Bloomberg News Annual Self-Evaluation, Jayne Cubbage, April 6, 2001, ("2001 Self-Evaluation") BLP 000203-04.) According to Plaintiff, the first sentence of the above paragraph was her rendition of her supervisor's opinion, but the rest of the paragraph was her own opinion. (Cubbage Dep. 37-39.) Plaintiff also wrote in her 2001 self-evaluation that:

> Upon learning of my difficulties in multimedia, [b]oth Carolynn Fedor and Jennifer Kushinka have met with me on a regular basis to help determine the nature of my problems and develop subsequent solutions. Despite regular meetings, I continued to struggle with my work. While noting the extensive effort put forth

comments or "code words" that Laird used in discussing Plaintiff. (Beal Dep. 14.)

10

> by Carolynn and Jennifer, I believe there was a misunderstanding
> on my part in terms of what was expected of me in the department
> and how I should proceed in meeting those expectations.

(2001 Self-Evaluation BLP 000205.)

In a May 2001 evaluation, Plaintiff's managers noted several areas of improvement and several other areas where Plaintiff still needed to improve. (Def.'s Mot., Ex. 8, Managers Evaluation, May 2001, BLP 000198-202.) At the end of Plaintiff's first year at Bloomberg, her salary remained at $55,000 and she was not awarded any additional equity equivalency certificates. (Def. Mot., Affidavit of Matthew Asman, dated March 2, 2009 ("Asman Aff.") ¶ 4.)

At the end of Plaintiff's second year at Bloomberg, Kushinka believed Plaintiff's performance was improving but was still unsatisfactory. (Def.'s Mot., Ex. 11, Bloomberg News Annual Self-Evaluation, April 1, 2002 ("2002 Self-Evaluation") BLP 000188.) Plaintiff stated that while her "performance over the past year [had] markedly improved," she "would like to continue to strive for error-free transcripts and improving Insights program." (*Id.* at BLP 000188, 193.)[12] Defendant's records indicate that between May 2001 and May 2002, Plaintiff was awarded three EECs. (Asman Aff. ¶ 4.) Defendant's records further indicate that in May 2002, Plaintiff received a raise of $2,000 and was awarded five EECs. (Asman Aff. ¶ 4.; Def. Mot., Ex. 13 ("Separation Verification") BLP 000052; Def. Mot., Ex. 14, "Disability Salary Records," BLP 000235.)[13]

---

[12]Plaintiff's work with the "Insights Program" consisted of "setting up radio interviews with Bloomberg News reporters and Bloomberg radio affiliates," in response to station requests relating to Bloomberg's daily news agenda. (2002 Self-Evaluation BLP 000187.)

[13]Plaintiff claims that she "never received a pay raise." (Cubbage Dep. 80.) It is unclear, however, whether Plaintiff contends that she never received any additional EECs at all, or that she never received a salary increase; Plaintiff provides no evidence to contradict Defendant's

At  the end of Plaintiff's third year at Bloomberg, Fedor and Kushinka believed Plaintiff's performance was improving but was still unsatisfactory.  (Def. Mot., Ex. 12, Global Broadcast Self-Evaluation, March 20, 2003, BLP 000182-83.)  In her self-review that year, Plaintiff states that she had "worked to improve [her] performance on transcripts," and that her goal was "to continue to improve in areas of [her] work through increased communication with [her] team leader and by expanding on [her] skill set by continuing to take [Bloomberg University] courses." (*Id.* at BLP 000183.)  Defendant maintains that in May 2003, Plaintiff received six additional EECs. (Asman Aff. ¶ 4).[14]

Bloomberg also had a culture of employees eating lunch at their desks rather than going out for lunch.  (Cubbage Dep. 171-72.)  Kushinka always ate at her desk, and all of the other employees except Plaintiff followed Kushinka's example.  (*Id.* at 172-73).  Plaintiff felt that she had a legal right to take a one-hour lunch break, so she would leave and go shopping or run errands during her lunch hour about three times a week. (*Id.* at 171-72.)  Because of this lunch practice, Plaintiff believed her colleagues considered her a "slacker."  (*Id.* at 173.)  Plaintiff felt this was racially discriminatory:

> I was the only African-American in the department working as a producer, and everyone else was going along.  And because I was sort of going against the grain, exercising my right no less, then that's discrimination because I was treated disparagingly because I exercised that right.  That's discrimination, because I'm an African-American and the other people are not African-Americans.

records of Plaintiff's salary increase from $55,000 to $57,000 in base salary or the May 2002 award of additional EECs.  *See* Separation Verification BLP 000052; Disability Salary Records BLP 000235.

[14]Neither party has provided any documentary evidence as to any additional EECs Plaintiff did or did not receive in May 2003.

> And they're going along, getting along, buying into the culture, and
> I'm saying, I don't buy into that. I have a right to take lunch. And
> it's discrimination because [Kushinka]'s using that as, Well, Jayne
> is a slacker, she's not committed, she's not one of us.

(*Id.* at 173-74.)

In July 2003, Plaintiff again requested to attend the NABJ conference. An HR representative informed her that she could attend with the permission of Kushinka; Kushinka denied Plaintiff's request on the grounds that Bloomberg's conference representation was full. (*Id.* at 140, 141-45; Def. Mot., Ex. 15, Kushinka Email to Cubbage, June 24, 2003 ("June 2003 Kushinka Email") BLP 000238.) At the time Plaintiff was working on a panel for the conference with Michelle Peal,[15] the African-American female employee who had been promoted by Fedor in 1999 from multimedia producer to Insights editor and was designated to lead Bloomberg's relationship with the NABJ. (Cubbage Dep. 147; Peal Aff. ¶¶ 8, 12).[16] Bloomberg paid for Peal to attend the conference and counted the time as work days; Kushinka informed Plaintiff that she could attend only if she paid her own way and traveled on her own time. (Peal Aff. ¶ 13; Cubbage Dep. 143-44; June 2003 Kushinka Email BLP 000238.) Plaintiff did ultimately attend the 2003 NABJ conference. (Cubbage Dep. 147.)

In mid-2003, Plaintiff applied for a transfer to work as a segment producer in

---

[15]Peal does not recall whether Plaintiff "was involved in this process" of putting together the NABJ panel. (Peal Aff. ¶ 14.)

[16]After being hired by Fedor in January 1998, Peal joined the broadcast television and radio team as a producer under a different supervisor in late 2003. (Peal Aff. ¶¶ 3, 10.) Under Fedor's supervision, Peal received compensation increases every year; over the course of her seven years at Bloomberg, Peal's annual salary increased from $57,000 to $70,000, and she received several additional EECs. (*Id.* ¶ 11.) Peal ultimately left Bloomberg in April 2005 because the Princeton news bureau closed and moved to New York, and Peal preferred to seek other employment in New Jersey. (*Id.* ¶ 3.)

Bloomberg's television department under Cynthia Costas. (*Id.* at 81-84; Def. Mot., Ex. 16, Cubbage Email to Costas, August 25, 2003, BLP 000254; Def. Mot., Ex. 17, Costas Email to Fedor, August 29, 2003 ("August 2003 Costas Email") BLP 000393.) At the outset, Costas indicated to Plaintiff that Plaintiff's credentials "looked good" and while a decision to hire Plaintiff into the segment producer position "hadn't been official," Plaintiff understood that Costas was "just waiting for desk space" for Plaintiff's transfer. (Cubbage Dep. 85.) However, in correspondence with Fedor soon thereafter, Costas stated that if "we really want to ramp up the seg[ment] prod[uction] team, [Plaintiff] may be better suited to a be a [production assistant]." (August 2003 Costas Email BLP 000393.) Fedor replied that Costas should "go ahead and talk to [Plaintiff]." (*Id.*)

On August 29, 2003, Costas expressed concern to Plaintiff about her qualifications for the segment producer position, and indicated that Bloomberg "need[ed] someone with more experience." (Cubbage Dep. 87.) Costas offered Plaintiff the opportunity to join the television department as a production assistant, but Plaintiff considered that position to be "a demotion, sort of an insult," because that had been her "first job at Fox years ago, as a production assistant," and she believed she was qualified for the segment producer position. (*Id.* at 87-88.)

Plaintiff learned later that afternoon that her father had died in a bus accident that day. (*Id.* at 86.) August 29, 2003 was the last day Plaintiff appeared in Bloomberg's offices. (*Id.* at 89.)

On September 2, 2003, Costas sought Fedor's permission to have Plaintiff take a test to measure her qualifications for the segment producer job; Plaintiff herself had apparently volunteered to take the test. (Def. Mot., Ex. 17, Costas Email to Fedor, September 2, 2003

("September 2003 Costas Email") BLP 000396.)[17]  Fedor approved the request, but Plaintiff

never took the test.  (*Id.*; Def. Mot., Ex. 38, Stevens Email to Fedor, December 11, 2003

("December 2003 Stevens Email") BLP 000415.)  After she left the office on August 29, 2003,

Plaintiff had no further contact with Fedor.  (Cubbage Dep. 92-93.)  After late September or early

October 2003, she had no further contact with Kushinka. (*Id.*)

###    B.    PLAINTIFF'S LEAVE OF ABSENCE AND TERMINATION

Plaintiff commenced a leave of absence in September 2003.  During her leave, Plaintiff

submitted three sets of short-term Family/Medical Leave Request forms, which Bloomberg

accepted.  (Def. Mot., Ex. 18, Family/Medical Leave Form, September 12, 2003 ("September

2003 FMLA Form") BLP 000004-10; Def. Mot., Ex. 19, Family/Medical Leave Form, October

9, 2003 ("October 2003 FMLA Form") BLP 000027-31; Def. Mot., Ex. 20, Family/Medical

Leave Form, November 11, 2003 ("November 2003 FMLA Form") BLP 000136-46.)[18]  In the

---

[17]Plaintiff contends that she "was never aware of any test required for the segment producer position."  (Pl. SOF ¶ 51.)  However, testimony to this effect is not of record and therefore the Court may only consider Plaintiff's position on this point as argument.

[18]Plaintiff claims that she "was made to fill out disability forms over ten (10) times."  (Pl. SOF ¶ 10.)  In her deposition, Plaintiff clarifies that HR asked her to correct her submitted forms "in excess of 10 times, easy," and that her doctor was required to repeat information on the corrected forms.  (Cubbage Dep. 101-103.)  Plaintiff submits no documentary evidence to the Court to this effect, however.  *See supra*, Section II.A., n.6.

In addition, Plaintiff argues that "Defendant admits that no new form should have been required after the October 9, 2003 form was accepted."  (Pl. SOF ¶ 57.)  In so doing, she cites to the deposition testimony of Gina Gibbons, Bloomberg's HR representative.  (*Id.* (citing Pl. Mot., Ex. 2, Dep. of Gina Gibbons ("Gibbons Dep.") 93.))  However, when asked why Plaintiff would have been required to submit a new form after the October 2003 FMLA Form was accepted, Gibbons testified only as follows:

Q:    So my first question to you regarding this form is, if we look at the other forms dated 10/9/2003, why would she have to have completed a new form, a new FMLA form, CNA form, disability form?

first form, Plaintiff requested one month of disability leave. (September 2003 FMLA Form BLP 000007.) The October and November 2003 FMLA Forms, which served to update Plaintiff's September 2003 FMLA form, stated the length of leave as "TBD" but the probable duration of Plaintiff's leave as six to 12 months. (October 2003 FMLA Form BLP 000028, 000030; November 2003 FMLA Form BLP 000137, 000139; Cubbage Dep. 258-59.) These two updated leave forms estimated Plaintiff's earliest return-to-work date as March 30, 2004. (October 2003 FMLA Form BLP 000034; November 2003 FMLA Form BLP 000146.)[19]

Plaintiff's short-term disability benefits were scheduled to expire on March 2, 2004.

---

A:     I don't know. I can't tell from this, what you've shown me here. I don't know the details of the situation. I just don't recollect.

Q:     Okay. And the form dated Exhibit 7, the form that you signed off on, what's the date that you signed off on that?

A:     This says 11/21/03 [...]

Q:     So do you know any reason why Ms. Cubbage would have had to complete a completely new FMLA form, completely new packet?

A:     No, I don't know why she would have to do that.

(Gibbons Dep. 93.) The Court does not interpret this testimony to mean that "no new form should have been required after the October 9, 2003 form was accepted" (Pl. SOF ¶ 57), but only that the HR representative could not recall at the time of deposition the reason as to why Plaintiff would have been required to submit a third form in November 2003.

[19]Plaintiff claims that her doctor "clearly indicated" that her "condition was due to the workplace." (Pl. SOCF ¶ 36 (citing Cubbage Dep. 240.) However, two of the three forms Plaintiff submitted to Bloomberg state that her condition was *not* caused by work. (September 2003 FMLA Form BLP 000009-10 (answering "No" to Question 12: "Did your disability result from an accident or illness caused by your work?" and indicating that Plaintiff's disability was "not related to her employment"); October 2003 FMLA Form BLP 000142 (again answering "No" to Question 12: "Did your disability result from an accident or illness caused by your work?").)

(Def. Mot., Ex. 24, Sack Email, January 22, 2004 ("January 2004 Sack Email") BLP 000107.)[20]

Indeed, Gibbons notified Plaintiff several weeks beforehand that her short-term disability benefits would terminate on that date, but that she might be eligible for long-term disability benefits going forward. (Def. Mot., Ex. 26, Gibbons Letter to Cubbage, February 27, 2004 ("February 2004 Gibbons Letter") BLP 000094.) At Plaintiff's request, however, Bloomberg extended her health benefits after her short-term disability benefits expired. (Def. Mot., Ex. 22, Gibbons Email to Sack, April 2, 2004 ("April 2004 Gibbons Email") BLP 000321; January 2004 Sack Email BLP 000107; Def. Mot., Ex. 25, Gibbons Note, January 16, 2004 ("Gibbons Note") BLP 000112; February 2004 Gibbons Letter BLP 000094; Cubbage Dep. 305-06 ("[A]s a courtesy, the company would actually go ahead and extend my benefits...they didn't have to continue to cover me under the benefits.").) While Plaintiff's 60% salary benefit was also scheduled to end on March 2, 2004, Bloomberg voluntarily continued to pay her that amount into May 2004. (April 2004 Gibbons Email; Def. Mot., Ex. 23, Sack Email to Norris, April 28, 2004 ("April 2004 Sack Email") BLP 000265-66; Disability Salary Records BLP 000235.)[21]

In February and March 2004, Gibbons called Plaintiff to inform her that CNA would be in contact with Plaintiff regarding her long-term disability benefits. (Gibbons Dep. 115-118.) In a letter dated March 9, 2004, CNA informed Bloomberg that CNA needed more information to assess Plaintiff's disability status. (Def. Mot., Ex. 28, Marron Letter to Johnson, March 9, 2004 BLP 000016.) Bloomberg left voicemail messages for Plaintiff on March 22, 23, 29 and 30,

---

[20]Bloomberg did not complete and submit Plaintiff's paperwork to its insurer, CNA, until January 2004.

[21]Plaintiff denies that Bloomberg continued to pay Plaintiff into May 2004, but without further explanation or any record support. (Pl. SOF ¶ 64.)

2004; Plaintiff did not return those calls. (Def. Mot., Ex. 29, Gibbons Letter to Cubbage, April 2, 2004 ("April 2004 Gibbons Letter") BLP 000087.)[22] On March 30, 2004, Bloomberg contacted Plaintiff's grandmother in an effort to locate Plaintiff; Plaintiff had previously provided her grandmother's telephone number to Bloomberg as Plaintiff's emergency contact. (Def. Mot., Ex. 30, Gibbons Email to Magee, March 30, 2004 BLP 000018; Def. Mot., Ex. 31, Bloomberg Note re: Helen Cornwell ("Cornwell Note") BLP 000089.) Plaintiff's grandmother stated that she "remembered that someone from [Plaintiff's] job called me, but I don't remember anything about the conversation." (Def. Mot., Supp. Ex. 5, Affidavit of Homer Cornwell ¶ 4.)

On April 2, 2004, Bloomberg left another voice message for Plaintiff, and mailed Plaintiff a letter asking her to contact Bloomberg. (April 2004 Gibbons Letter BLP 000087.) Plaintiff did not respond to the April 2, 2004 voice message or letter. (*Id.*; Cubbage Dep. 313-316.)[23] At no point did Bloomberg mention workers' compensation to Plaintiff, despite

---

[22]Plaintiff contends that "[i]n accordance with Bloomberg and CNA's instructions, in March 2004, Ms. Cubbage's doctor provided CNA with documentation indicating Ms. Cubbage needed additional disability time to recover and estimated a return date of June 2, 2004." (Pl. SOF ¶ 65.) In support of this position, Plaintiff cites to Exhibit 7 to Dr. Earle McNeill's deposition, which states Plaintiff's "estimated return to work date" as "end of May 2004" and her "release to return to work date"as "June 2, 2004." (*Id.*) However, while Plaintiff does attach said Exhibit–a document titled "Functional Assessment Tool"–as Exhibit 4 to her Opposition to Defendant's Motion, the document is clearly marked "DRAFT" on the top of its first page and Dr. McNeill's signature line remains blank. (Pl. Opp., Ex. 4, Functional Assessment Tool.) Furthermore, there is no indication on the Functional Assessment Tool as to whether or when it was itself provided to the CNA, or what documentation may have accompanied it. (*Id.* (directing reader to "[s]ee attached progress notes of individual sessions from 9/03 to present" but no such notes attached).) The Court notes, however, that Bloomberg admits that McNeill testified that he submitted the unsigned Functional Assessment Tool to CNA in March 2004. (Def. Opp. to Pl. SOCF ¶ 42.)

[23]Plaintiff claims that the April 2004 Gibbons Letter "falsely indicates that Ms. Cubbage had not provided Bloomberg with medical documentation to continue her disability leave" and that Plaintiff had in fact "provided CNA with medical documentation indicating her leave would

Bloomberg's internal conversations on the subject. (Gibbons Dep. 83-87.)

In her EEOC Charge, Plaintiff stated that "[b]ecause she was unable to return to work, [her] attorney submitted a letter of resignation on [her] behalf on or about April 7, 2004." (Def. Mot., Ex. 2, EEOC Charge, Oct. 4, 2004 BLP 000038.)[24] In a letter dated April 9, 2004, CNA informed Bloomberg that it was "suspending the processing of [Plaintiff's long-term disability claim]" because it had "not received the information [it] requested from her." (Def. Mot., Ex. 32, Marron Letter to Dodd, April 9, 2004 ("Marron Letter") BLP 000014.)

Around the same time, Bloomberg received an "Employer's Notice of Application" from the Pennsylvania Department of Labor ("PADOL"), indicating that Plaintiff had applied for unemployment benefits from the state of Pennsylvania. (Def. Mot., Ex. 33, Will Letter to Bloomberg ("Notice") BLP 0048-50.) The Notice states that the "claimant has indicated the reason for separation or partial unemployment as: QUIT -HEALTH OR OTHER REASONS." (*Id.* BLP 000050.) The Notice also states that it was mailed to Bloomberg on April 9, 2004, as well as faxed to Bloomberg on April 27, 2004. (*Id.* BLP 000048-50.)[25] PADOL records reflect

last at least until June 2, 2004." (Pl. SOF ¶ 69.) In support of this position, however, Plaintiff cites only the Functional Assessment Tool, marked "DRAFT" and lacking any accompanying documentation or indication that it was in fact provided to CNA. *See supra*, Section II.A., n.14.

[24]Bloomberg does not have any record of said letter, and Plaintiff now claims that "[n]o resignation letter was ever submitted on Ms. Cubbage's behalf." (Pl. SOF ¶ 71.) When asked at her deposition as to whether she submitted a letter of resignation, Plaintiff responded, "I don't believe I did," while agreeing that she did sign the EEOC Charge, which stated that she had submitted the letter of resignation. (Cubbage Dep. 285.)

[25]The Notice appears to reflect several inconsistent responses on Bloomberg's part. First, it reflects Bloomberg's erroneous statement that Plaintiff's last day of work was November 24, 2003. (Notice BLP 000050, 000053; Gibbons Dep. 153-54.) Second, it appears to indicate that Bloomberg paid Plaintiff's full wages through May 3, 2004, as opposed to the 60% salary benefit Bloomberg extended to that date. (Notice BLP 000050.) Finally, while the Notice requests

that on April 8, 2004, Plaintiff applied for unemployment benefits; Bloomberg correspondence and notes refer to the same.  (Def. Mot., Ex. 35, McClain Letter to Stoltzfus, October 24, 2008 ("October 2008 McClain Letter") BLP 002148-64; Def. Mot., Affidavit of Kenneth E. McClain II ("McClain Aff.") ¶ 3; April 2004 Sack Email; Def. Mot., Ex. 34, Bloomberg Notes, April 14, 2004 BLP 000083.)  Plaintiff was subsequently denied unemployment benefits on April 20, 2004 pursuant to "sections 402(b) and 401(d)(1) of the Unemployment Compensation law, " which deny such benefits to individuals who leave their employment positions voluntarily or are unavailable for suitable work.  (October 2008 McClain Letter BLP 002148-64; McClain Aff. ¶ 4 (citing 43 Pa. C.S. §§ 802(b) and 801(d)(1).)[26]

In a letter dated May 3, 2004, Bloomberg terminated Plaintiff's employment.  (Def. Mot., Ex. 36, Sack Letter to Cubbage, May 3, 2004 BLP 000045.)  The letter stated that Bloomberg considered Plaintiff to have "abandoned [her] position" and that Bloomberg was "eager to hear from [her]," as Plaintiff had not contacted Bloomberg from the time Defendant left her a voice message on March 22, 2004.  (*Id.*; April 2004 Gibbons Letter FLP 000087; Cubbage Dep. 313-317.)

## C.    PLAINTIFF'S EEOC CHARGE

On October 4, 2004, following her attorney's review, Plaintiff signed and filed a Charge

---

Bloomberg's response to the PADOL by May 4 or 6, 2004, Bloomberg did not fax its response until May 12, 2004.  (*Id.* at 000049-50.)

[26]Plaintiff does not recall applying for unemployment benefits in April 2004, but believes she applied for such Pennsylvania benefits in May 2004.  (Cubbage Dep. 282-83, 285-86.) Plaintiff contends that she did ultimately receive unemployment benefits from New Jersey, but her cited deposition testimony reflects only that she sought such benefits from New Jersey, not that she received them.  (Pl. SOF ¶ 80 (citing Cubbage Dep. 282-83).)

against Bloomberg with the EEOC and with the NJDCR. (EEOC Charge BLP 000038; 2d Am. Compl. ¶ 5; Cubbage Dep. 34.) The Charge lists the starting date of the acts of discrimination as June 1, 2003. (EEOC Charge BLP 000038.)[27] The Charge alleges events relating to Bloomberg's failure to promote Plaintiff as well her termination by Bloomberg. (*Id.*)

III.  **LEGAL STANDARD**

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to a material fact and that the moving party is entitled to a summary judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c). In order to defeat a motion for summary judgment, disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law; and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. An issue is genuine if the fact finder could reasonably return a verdict in favor of the non-moving party with respect to that issue. *Anderson*, 477 U.S. at 248. In reviewing a motion for summary judgment, the court "does not make credibility determinations and must view facts and inferences in the light most

_____

[27]Plaintiff now argues that the "starting date of June 1, 2003 does not encompass the entire period of harassment and discrimination by Bloomberg" and that the date is for "statistical purposes only." (Pl. SOF ¶ 86 (citing Cubbage Dep. 32-33 ("I wouldn't say the discrimination began on June 1st, 2003 [but] [a]s soon as I started working there.")).)

favorable to the party opposing the motion." *Seigel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

## IV.   DISCUSSION

### A.   DISCRIMINATION CLAIMS

Plaintiff appears to argue primarily four different theories of discrimination: (1) hostile work environment based on race, gender and disability discrimination; (2) failure to promote, based on race, gender and disability discrimination; (3) discriminatory pay, based on race and gender discrimination; and (4) wrongful termination, based on race, gender and disability discrimination.  Plaintiff's claims thus come under the general umbrella of Title VII and the ADA, and then under the NJLAD, based on race, gender and disability discrimination.  In addition, she brings her IIED claim under Pennsylvania state law.[28]

Under Title VII, it is unlawful for an employer "to discharge any individual ... because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1) (2003).[29]  Where, as here, the plaintiff presents only circumstantial evidence of wrongful discharge based on any of these protected classes, the *McDonnell Douglas* burden-shifting framework governs. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Jones v.*

---

[28]While Plaintiff's briefing argues her discrimination claims only on hostile work environment and wrongful termination grounds, and appears to waive any failure-to-promote and discriminatory pay claims, her Second Amended Complaint says otherwise; in an abundance of caution, the Court will address all four potential grounds, as Defendant has done.  (Pl. Mem. at 1, 5-20; 2d Am. Compl. ¶¶ 24-25; 27, 45; Def. Mem. at 22.)

[29]Courts apply the same analytical framework to discrimination claims brought under the NJLAD and ADA as to those brought pursuant to Title VII.  *Hutchins v. United Parcel Service, Inc.*, 197 Fed. App'x 152, 156 (3d Cir. 2006) (citing *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001) (NJLAD claims examined under Title VII standard); *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007) (ADA and ADEA examined under Title VII standard).

*Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999). First, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 801-802. Second, if the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If the defendant is able to carry that burden, the burden of proof shifts back to the plaintiff to show that the defendant's proffered reasons are pretextual. *Id.* at 801-04; *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).

### 1.    Hostile Work Environment

With regard to race and gender discrimination, Plaintiff's hostile work environment claim is premised primarily on the following acts: (i) criticisms of her performance; (ii) assignment to edit transcripts; (iii) prohibition against her attendance at two conferences; (iv) criticism for telephone and internet usage; (v) rude treatment by coworkers; and (vi) racist comments by a male coworker. As to disability discrimination, Plaintiff bases her hostile work environment claim on the following incidents arising subsequent to her taking disability leave from her position at Bloomberg: (i) Defendant's requirement that she re-file disability claims forms to correct alleged errors; (ii) telephone contact by Defendant's HR representative after six months of short-term disability coverage had elapsed regarding Plaintiff's anticipated return-to-work date; (iii) repeated telephone contact by Defendant seeking further information regarding Plaintiff's anticipated return to work; and (iv) when Plaintiff did not respond to Defendant's calls, telephone contact of Plaintiff's listed emergency liaison.

### a.    *Prima Facie* Case

To establish a *prima facie* hostile work environment claim, a plaintiff must demonstrate

that: (1) she suffered intentional discrimination because of her membership in a protected class; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same protected class in that position; and (5) there is a basis for employer liability. *Hamera v. County of Berks*, 248 Fed. App'x 422, 424 (3d Cir. 2007). Defendant does not contest that Plaintiff presents evidence sufficient to establish the third and fifth prongs of a *prima facie* case. *See* Def. Mem. at 23. However, as Defendant argues, she fails to do so with regard to the first, second and fourth elements.

### (i) Intentional Discrimination

To demonstrate that she suffered intentional discrimination, a plaintiff must show that the alleged hostility was motivated by discriminatory animus. *See Mathews v. Herman*, No. 07-1318, 2008 WL 1914781, at *11 (E.D. Pa. Apr. 20, 2008). Plaintiff, however, has simply stated that her colleagues' treatment of her must have been discriminatory because they were committed against her and she is African-American, female and/or disabled. Without more, such speculation and circular reasoning cannot withstand summary judgment. *See Johnson v. St. Luke's Hosp.*, No. 07-4467, 2009 WL 154377, at *2 (3d Cir. Jan. 23, 2009).

In *Johnson*, the Third Circuit affirmed that any disparate treatment suffered by the employee plaintiff was not causally related to her termination, and found that nearly all of her claims of racial discrimination were either "purely speculative" or unsupported by facts in the record." *Id.* The district court in *Johnson* had demonstrated the failure of the plaintiff's claims by citing an excerpt of the plaintiff's deposition testimony:

> I mean, what else can I say other than race? I know she did it because I'm black. What other reason why she would do it [*sic*]? There is no–because she doesn't like me? No, I don't think so. Why doesn't she like me? Because I'm an African American black woman and that's why.

*Johnson v. St. Luke's Hosp.*, No. 06-3417, 2007 WL 3119845, at *9 (E.D. Pa. Oct. 23, 2007).

Here, Plaintiff offers no evidence in support of her belief that she was discriminated against because she is African-American, female and/or disabled. Similarly to the plaintiff in *Johnson*, she merely speculates that the hostility was based on her race: "Because I was the only African American in the department working as a producer." (Cubbage Dep. 45.) With regard to why she believed she was discriminated against for taking her lunch breaks while coworkers ate at their desks, Plaintiff responded: "That's discrimination, because I'm an African American and the other people are not African-Americans. And they're going along, getting along, buying into the culture, and I'm saying, I don't buy into that. I have a right to take lunch." (Cubbage Dep. 173-74.) As for why she felt the denial of her transfer request was based on race, she stated that it was "[b]ecause I was the only African American in the department at the time, and I wasn't allowed to change...." Cubbage Dep. 223-34.) Indeed, despite discussing at length the ways in which she felt mistreated while on her leave of absence, Plaintiff does not even speculate as to how or provide any record support for her position that any such harassment was due to her disability. *See* Pl. Mem. at 12 (discussing repeated contact by telephone and letter without any showing of discriminatory animus).

### (ii) *Severe or Pervasive Discrimination*

As to the second *prima facie* prong for a hostile environment claim, a plaintiff must demonstrate that the discrimination she suffered was severe or pervasive. *See Hamera*, 248 Fed.

App'x at 424. In weighing whether discrimination was severe or pervasive, "occasional insults, teasing, or episodic instances of ridicule are not enough." *Jensen v. Potter*, 435 F.3d 444, 451 (3d Cir. 2006), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Instead, the Court must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "No one factor is dispositive, and the analysis must focus on the 'totality of the circumstances.'" *Vrom v. A. Crivelli Buick Pontiac GMC, Inc.*, No. 08-182, 2010 WL 1052951, at *6 (W. D. Pa. Mar. 22, 2010) (quoting *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990)).

Here the totality of the circumstances simply does not equate to severe and pervasive discriminatory conduct. Plaintiff did report two specific comments she believed represented racial bias. Editor Jerry Laird stated that a man on death row should not have undertaken a "lifestyle of crime" and "[t]hose people ought to know better...They always get themselves into this kind of situation." (Cubbage Dep. 56.) Laird also mentioned that an individual who had been calling his daughter was named Terrell, which Plaintiff believed "allud[ed] to the fact that the young boy was African American" and understood it be "racist," because it was "typically...a quote/unquote, African/American name." (Cubbage Dep. 55.) One does not need to have "been there" to understand and empathize with Plaintiff over the offensive feeling generated by these two separate sentences attributed to Laird by Plaintiff, referencing "those people" and "Terrell." The Court understands.

However, these comments, while potentially offensive, are ambiguous enough that they

fail to suggest racial animosity or a racially hostile work environment. *See Noel v. Boeing Co.*, No. 06-CV-2673, 2008 WL 1999757 (E.D. Pa. May 8, 2008) (granting employer summary judgment where plaintiff claimed he was repeatedly cursed at by his coworkers and told he was a "f---ing Haitian" who should "go back to [his] country). Indeed, even if Laird's comments did suggest animosity, they are "not enough to show the kind of severe [or] pervasive *racial* discrimination that is necessary to make out a prima facie case of hostile work environment." *Id.* at *21 (emphasis in original).

In addition, Plaintiff herself admitted non-discriminatory reasons for Bloomberg's treatment of her, harsh though it may have been. In her self-evaluations, Plaintiff concurred that her performance required improvement; at deposition, she testified that her supervisors did indeed believe they were trying to help her progress. (Cubbage Dep. 30-41; 2001 Self-Evaluation BLP 000205.) She also acknowledged that she was assigned to format transcripts due to her poor performance. (Cubbage Dep. 165-68.) In light of Plaintiff's documented admissions that she needed to improve her work product (2001 Self-Evaluation BLP 000203-05; 2002 Self-Evaluation BLP 000193; March 2003 Self-Evaluation BLP 000183), her claim of putting forth her "best effort" is not enough to suggest an otherwise hostile work environment. *See Hunter v. Rowan Univ.*, 299 Fed App'x 190, 195 (3d Cir. 2008) (plaintiff's allegation that she was "certainly trying to do the best that she could" was "not enough to survive summary judgment").

Plaintiff argues that Carolynn Fedor specifically directed discriminatory animus towards her, yet Fedor was the individual who interviewed and hired Plaintiff. Furthermore, Fedor supervised and promoted Michelle Peal, another African-American woman who felt fairly treated by Fedor. (Peal Aff. ¶¶ 8-9.) In fact, despite Plaintiff's contention that she was not allowed to

attend the NABJ conference because of her race and/or gender, Fedor expressly sent Peal to the same conference each year, and commissioned Peal to establish a special relationship between Bloomberg and NABJ. (Cubbage Dep. 138; Peal Aff. ¶¶ 13-14.) Finally, it is Peal to whom Plaintiff points as an example of another employee receiving better treatment than Plaintiff with regard to internet and telephone usage. (Cubbage Dep. 123, 424.)[30] While not dispositive, these facts inevitably undermine Plaintiff's claims of intentional discrimination based on her race and gender. *See Jones v. Univ. of Pa.*, No. 00-2695, 2003 WL 21652083, at *2 (E.D. Pa. Mar. 20, 2003) (granting employer summary judgment on wrongful termination claim based on race; while plaintiff is not required to show that employees outside the relevant protected class were treated more favorably, "the fact that a plaintiff claiming discrimination was replaced by an individual from within the same protected class 'might have some evidentiary force, and it would be prudent for a plaintiff in this situation to counter (or explain) such evidence'") (quoting *Pivirotto v. Innovative Sys. Inc.*, 191 F.3d 344, 354 (3d Cir. 1999)); *Murray v. Gilmore*, 406 F.3d 708, 715 (D.C. Cir. 2005) ("...[A] replacement within the same protected class cuts strongly against any inference of discrimination.")

As to Plaintiff's disability discrimination claim, her allegations again fail to rise to the requisite level of severity or pervasiveness necessary to establish a *prima facie* case. Plaintiff was asked on several occasions to correct errors in her disability claims forms, and Bloomberg attempted to contact Plaintiff twice by written correspondence and six times by telephone (once

---

[30]While Plaintiff testified that Laird was viewing "pornographic" material on his computer at work when she observed a "nude silhouette" on his monitor, she herself admitted that she did not bring this fact to the attention of anyone at Bloomberg and thus could have no knowledge as to whether he was ever disciplined for this internet usage. (Cubbage Dep. 430-31.)

via her emergency contact) in order to confirm her leave status and to procure additional information so that CNA could continue to process her disability coverage while she was on leave. (February 2004 Gibbons Letter BLP 000094; Gibbons Dep. 115-118; April 2004 Gibbons Letter BLP 000087; Cornwell Note BLP 000089.) Plaintiff never responded to these efforts to contact her. (April 2004 Gibbons Letter BLP 000087.) The Court cannot find that these letters and telephone calls, which Bloomberg undertook to ensure that Plaintiff did in fact receive any necessary long-term disability coverage, were unduly severe or pervasive in nature. Taken together, these incidents fail to strike the Court as frequent, offensive or threatening, or unreasonably interfering with Plaintiff's work performance such as to be considered severe or pervasive.

*(iii)     Detrimental Effect on a Reasonable Person*

While Plaintiff's evidence adequately demonstrates she was indeed detrimentally affected by Bloomberg's treatment of her, she must also point to evidence from which a reasonable person would have found that the conduct was so severe or pervasive that it altered the conditions of employment. *See Harris*, 510 U.S. at 21; *Koschoff v. Henderson*, 109 F. Supp. 2d 332, 348 (E.D. Pa. 2000) (detrimental effect prong acts as "a check on the overly sensitive plaintiff who is unreasonably affected by acts of discrimination"). The Third Circuit has recognized the overlap between this element and the severe and pervasive element. *See Jensen*, 435 F.3d at 451. As discussed above, *supra* Section IV.A.1.a(ii), upon consideration of such evidence, the court must focus on the frequency and severity of any alleged discriminatory conduct, whether it is physically threatening or humiliating or merely an offensive utterance, and whether it unreasonably interferes with an *reasonable person's* work performance. *See Harris*,

510 U.S. at 23; *Reynolds v. USX Corp.*, 56 Fed App'x 80, 82 (3d Cir. 2003). As before, conclusory assertions of hostility and criticism are not enough to survive summary judgment. *See Barbosa v. Tribune Co.*, No. 01-1262, 2003 WL 22238984, at *4 n.15 (E.D. Pa. Sept. 25, 2003).

Plaintiff does indeed paint a picture for the Court of a tense and unpleasant work atmosphere in her department. Her supervisors criticized her performance repeatedly, assigned her to work she found menial in nature, declined to sponsor her attendance at conferences she requested, and criticized her telephone/internet usage and lunch break habits. In addition, she was subjected to inappropriate comments from co-workers that she regarded as racially coded. While certainly regrettable, especially in light of Bloomberg's well-publicized and ongoing discrimination-related litigation in other courts,[31] these allegations and those relating to Bloomberg's contact of Plaintiff while she was on disability leave are insufficient to show that a reasonable person would have found Defendant's treatment severe or pervasive enough to change the conditions of Plaintiff's employment. *See Barbosa*, 2003 WL 22238984, at *3 (three specific racist remarks, negative weekly evaluations not directly linked to a discriminatory motive, and

---

[31]Plaintiff cites three cases in the Southern District of New York in support of her position that Bloomberg has demonstrated a pattern of discriminating against employees on the basis of race, gender or disability. *See* Pl. Mem. at 13 (citing *Prestia v. Bloomberg, L.P.*, 07-cv-6003 (S.D.N.Y. June 25, 2007) (alleging pregnancy discrimination); *Patterson v. Bloomberg, L.P.*, 04-cv-4603 (S.D.N.Y. June 18, 2004) (alleging race and disability discrimination); *Kono v. Bloomberg L.P., et al*., 05-9843 (S.D.N.Y. Nov. 21, 2005) (alleging age and disability discrimination)). However, the parties in each of those cases stipulated to dismissal of the action before any summary judgment motions were filed or decided, providing this Court no discussion of the merits of the plaintiffs' underlying claims. Plaintiff also cites the class action brought against Bloomberg for disability discrimination. *See* Pl. Mem. at 14 (citing *EEOC v. Bloomberg, L.P.*, 07-cv-8383 (S.D.N.Y. Sept. 27, 2007)). However, the EEOC action remains pending, with a summary judgment motion as to time-barred claims yet to be decided, again providing this Court no guidance as to the substantive issues relating to the EEOC's discrimination claims.

conclusory allegations of discrimination were insufficiently severe to withstand summary judgment on hostile environment claim); *Kidd v. MSNA Am. Bank, N.A.*, 93 F. App'x 399, 402 (3d Cir. 2004) ("[Plaintiff] presents evidence that a male co-worker made several disparaging remarks to her which referenced her national origin and that he made other threatening comments including references to a gun. These comments were certainly obnoxious and had no place in the work environment. However, these comments by a single co-worker do not establish that discrimination was pervasive and regular.").

These isolated incidents, ambiguous at best, lack the intentionality, severity, pervasiveness or detrimental affect on a reasonable person such as to satisfy Title VII, the ADA or NJLAD's *prima facie* standard. As a matter of law, therefore, Plaintiff's discrimination claim for hostile work environment must fail.[32]

---

[32]In addition to failing to establish a *prima facie* case of hostile work environment, Plaintiff has failed to exhaust this claim by raising it in her EEOC Charge. *See Antol v. Perry*, 82 F.3d 1291, 1295-96 (3d Cir. 1996) (plaintiff must exhaust Title VII claims); *Deily v. Waste Mgt. of Allentown*, 118 F. Supp. 2d 539, 541 (E.D. Pa. 2000) (plaintiff must exhaust ADA claims). Plaintiff's EEOC Charge alleged only a failure to promote and resignation based on alleged failure to accommodate, not a hostile work environment. (EEOC Charge BLP 0000038.) Her EEOC Charge contains none of the facts that she raised in her Complaint relating to her hostile work environment claim. *See Ocasio v. City of Bethlehem*, No. 08-3737, 2009 WL 37518, at *3 (E.D. Pa. Jan. 7, 2009) (dismissing hostile work environment claim for failure to exhaust it where EEOC charge alleged only that defendant had discriminated against plaintiff by failing to promote him on the basis of his race; facts underlying failure-promote claim were of a different "nature and type" than those underlying hostile work environment claim); *Eaddy v. Pa. Dep't of Public Welfare Berks County Assistance Office*, No. 04-5959, 2005 WL 1324881, at *2 (E.D. Pa. June 2, 2005) (granting summary judgment where plaintiff's EEOC charge did not give EEOC notice of hostile work environment claim and there was no evidence that EEOC had investigated whether plaintiff had been subjected to hostile work environment).

In light of this failure and the lack of a *prima facie* case, the Court need not reach Defendant's argument that Plaintiff's hostile work environment claim is time-barred. *See, i.e., Vernon v. A&L Motors*, No. 09-1944, 2010 WL 2089640, at *3 (3d Cir. May 26, 2010) ("Because we conclude that Vernon has failed to make out a *prima facie* case [of gender discrimination], we need not reach the issue whether Vernon established that A & L's proffered

## 2.  Failure to Promote

a.   *Prima Facie* Case

As with her hostile work environment claim, Plaintiff must first establish a *prima facie* case of discrimination with regard to her failure-to-promote claim in order to survive summary judgment.  *See supra*, Section IV.A. (citing *McDonnell-Douglas*, 411 U.S. at 801-02).  To do so, she must show that (i) she belongs to a protected class; (ii) she applied for and was qualified for a particular position; (iii) she was rejected for the position; and (iv) after the rejection, the position remained open and Defendant continued to seek applications from persons with Plaintiff's qualifications.  *See Allen v. Nat'l R.R. Passenger Corp.*, No. 07-3781, 2005 WL 2179009, at *6 (E.D. Pa. Sept. 6, 2005).  Bloomberg argues that Plaintiff cannot satisfy any of these prongs other than the first.  *See* Def. Mem. at 35.  The Court agrees.

*(i)    Qualifications for Position*

In order to demonstrate that she was qualified for a promotion denied to her, a plaintiff must provide objective proof of her qualifications.  *See Spangle v. Valley Forge Sewer Auth.*, 839 F.2d 171, 174 (3d Cir. 1988) (affirming summary judgment where "nothing in the record evidence . . . support[ed] a finding that [plaintiff] was performing satisfactorily the . . . duties which were required by his original job description," other than plaintiff's own belief as to his qualifications).  Here Plaintiff provides no such evidence, other than her testimony that Costas indicated that Plaintiff's credentials "looked good" when Plaintiff applied for a transfer to work as a segment producer in Bloomberg's television department under Costas.  (Cubbage Dep. 85.) Indeed, Cubbage recalled that at the outset Costas expressed concern about Plaintiff's

_____

reasons for terminating her were pretextual.").

32

qualifications and Bloomberg's need for a segment producer with "more experience."  (*Id.* at 87.)

Despite this, Costas sought Fedor's approval for Plaintiff to take a qualifications test for the

position, which Fedor approved.  (September 2003 Costas Email BLP 000396.)  As Plaintiff left

Bloomberg on disability leave prior to taking this test, Bloomberg never had the opportunity to

determine whether she was in fact qualified for the segment producer position.  (December 2003

Stevens Email BLP 000415.)

*(ii)      Rejection for Position*

As explained above, because she went out on leave, Plaintiff never took the qualifications

test for the segment producer promotion, and thus never completed her application.  (*Id.*)  As a

result, Bloomberg never made a decision to accept *or* reject her for the position transfer.  *See*

*Mihalik v. Eckerd Corp.*, No. 03-6002, 2005 WL 35918, at *4-5 (E.D. Pa. Jan. 7, 2005) (granting

summary judgment where plaintiff could not demonstrate that she was rejected for a promotion;

court determined that position at issue was not in fact even considered a promotion).

*(iii)     Open Position Continuing to Accept Applications from*
*Others with Plaintiff's Qualifications*

Plaintiff has offered no evidence that the segment producer position remained open or

that any other individuals applied for it after she did, regardless of their qualifications.  As such,

she is unable to show that Bloomberg "continued to seek applications from persons of plaintiff's

qualifications," as required to establish a *prima facie* case.  *See Chiaradonna v. Rosemont Coll.*,

No. 06-1015, 2008 WL 282253, at *7 (E.D. Pa. Jan. 31, 2008) (granting summary judgment on

failure to promote claim based on gender discrimination because "plaintiff [was] unable to

demonstrate that he was treated less favorably than similarly-situated women"); *O'Neal v.*

33

*Brownlee*, No. 03-5535, 2004 WL 2827052, at *8 (E.D. Pa. Dec. 9, 2004) (granting summary judgment where plaintiff failed to show that a similarly situated person from non-protected class was promoted instead of plaintiff).[33]

Plaintiff has failed to demonstrate her qualifications for the segment producer position, her rejection for said position, or that said position remained open to other applicants with her qualifications such as to satisfy Title VII, the ADA or NJLAD's *prima facie* standard. As such, Plaintiff cannot prevail on her failure-to-promote discrimination claim.[34]

### 3. Discriminatory Pay

#### a. *Prima Facie* Case

Again, as with her hostile work environment and failure-to-promote claims, Plaintiff must establish a *prima facie* case of discriminatory pay in order to survive summary judgment on this

---

[33]The Court also notes that Bloomberg did in fact promote Michelle Peal, a member of Plaintiff's protected race and gender classes. *See* Peal Aff. ¶¶ 8, 12. However, as Peal did not apply for the segment producer position at issue here, the Court does not consider her promotion germane to Plaintiff's specific claim.

[34]In addition to failing to meet the requirements for a *prima facie* case, Plaintiff's federal failure-to-promote claim is time-barred because it is based on events that occurred in August 2003, well beyond 300 days before the October 2004 filing of her EEOC Charge. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). The continuing violation doctrine does not apply here, as a failure to promote is a discrete act, uncovered by said doctrine. *See Fusco v. Bucks County of Pa.*, No. 08-2082, 2009 WL 4911938, at *6 (E.D. Pa. Dec. 18, 2009) ("[T]he 300 day deadline imposed by Title VII is strictly enforced when the employment actions challenged as discriminatory are isolated, discrete acts, such as the failure to promote.") (citing *Morgan*, 536 U.S. at 113)).

Furthermore, Plaintiff elected to file her failure-to-promote claim with the NJDCR, which foreclosed her ability to pursue it in court, other than to appeal the NJDCR's decision. *See* N.J.S.A. § 10:5-27; *Hernandez v. Region Nine Housing Corp.*, 684 A.2d 1385, 1390 (1996). In light of these bars and the lack of a *prima facie* case, the Court need not reach Defendant's additional argument that Plaintiff cannot show that Bloomberg's legitimate reason for not transferring her to the segment producer position was a pretext for discrimination. *See Vernon*, 2010 WL 2089640 at *3.

claim.  *See supra*, Section IV.A (citing *McDonnell-Douglas*, 411 U.S. at 801-02).  To meet this standard, Plaintiff must show that (i) she belongs to a protected class; (ii) she suffered some form of adverse pay action; and (iii) the circumstances give rise to an inference of unlawful discrimination.  *See Lewis v. Kinko's of Ohio*, No. 99-3028, 2004 WL 764382, at *7 (E.D. Pa. Mar. 31, 2004) (citing *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318-19 (3d Cir. 2000).[35]  Bloomberg contends that Plaintiff cannot meet the second and third elements, and once again the Court agrees.[36]

*(i)        Adverse Pay Action*

Plaintiff appears to premise her discriminatory pay claim on her assertion that she never received a salary increase or any additional equity equivalency certificates after being hired by Bloomberg.[37]  Bloomberg objects that "documentary evidence, however, proves otherwise," and points to its records indicating that Plaintiff was awarded three EECs during her second year at Bloomberg, five EECs and a $2,000 raise at the end of her second year, and six EECs at the end

_____

[35]NJLAD claims based on race discrimination are analyzed under the Title VII/*McDonnell Douglas* framework.  *See Vega v. City of New Brunswick*, 171 F. App'x 930, 935 (3d Cir. 2006).  For NJLAD claims based on gender discrimination, however, the slightly different standard of the Equal Pay Act, 29 U.S.C. § 206(d), applies.  *See Grigoletti v. Ortho Pharm.*, 570 A.2d 903, 913 (N.J. Super. Ct. App. Div. 1996).  The Equal Pay Act standard requires a plaintiff to show that an employer pays different wages to employees of opposite sexes "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions."  29 U.S.C. § 206(d).  As such, NJLAD's standard is even more exacting than that of Title VII; since Plaintiff's discriminatory pay claim does not survive Title VII scrutiny for the reasons discussed, it necessarily fails to meet NJLAD's standard as well.

[36]Defendant does not contest Plaintiff's status as a member of a protected class.

[37]As noted earlier, Plaintiff does not raise any arguments relating to her discriminatory pay claim in her opposition to Defendant's summary judgment motion.  *See supra*, Section III.A., n.28.

of her third year. *See* Def. Mem. at 41 (citing Assman Aff. ¶ 4; Separation Verification BLP 000052; Disability Salary Records BLP 000235). In response, Plaintiff has simply insisted that this is not the case, and while providing no evidence of her own, relies upon Bloomberg's lack of payroll evidence in support of her position. *See* Pl. Mem. at 10 n.4.

The Court is genuinely troubled by Bloomberg's poor documentation of its employee's compensation information. While Defendant has submitted documentation relating to the alleged additional equity certificates and salary raise, these documents hardly appear to be standard accounting or payroll records, and the Court struggles to understand why Bloomberg would not provide more substantial evidence to this end. However, Plaintiff's bald assertion that Bloomberg never raised her pay still fails to create a genuine dispute of material fact sufficient to overcome summary judgment. *See Gen. Ins. Co. Of Am. v. E. Consol. Utils., Inc.*, No. 94-4388, 1995 WL 428685, at * 7 (E.D. Pa. July 18, 1995) (defendants' mere denial of knowledge as to the truth of damages evidence put forth by plaintiff was insufficient to defeat summary judgment; defendants could have attempted to locate lost or unavailable records, submitted the affidavit of their accountant, contacted their bank for duplicates of lost statements, etc.). Plaintiff provides no extrinsic evidence as to her pay rate whatsoever, and as such cannot refute that put forward by Defendant.

More importantly, even if Plaintiff demonstrated that she did not receive any increase in compensation during her Bloomberg employment, she still has not provided any evidence to establish that other comparable employees were paid more than she was. Without this comparator information, the Court cannot conclude that she was subject to any adverse pay action. *See Watson v. Eastman Kodak Co.*, 235 F.3d 851, 857 (3d Cir. 2000) (affirming

summary judgment for employer on discriminatory pay claim where plaintiff "failed to identify through extrinsic evidence his pay rate, or those of comparable employees, and he provided no evidence of the last date he received a paycheck"); *Beaubrun v. Thomas Jefferson Univ.*, 578 F. Supp. 2d 777, 782 (E.D. Pa. 2008) (granting summary judgment to employer because plaintiff could not prove occurrence of adverse pay action where she did not provide any evidence that her pay was less than her predecessor's).

### (ii)    Inference of Discrimination

As with her hostile work environment claim, Plaintiff fails to provide objective proof that her allegedly lower pay was a result of discrimination. *See Nagle v. Risk Mgmt. Ass'n*, 513 F. Supp. 2d 383, 388 n.2 (E.D. Pa. 2007) ("Plaintiff's own belief that disparities in pay could not be explained by performance or other facts is not sufficient to survive summary judgment."). (citation omitted).  As Defendant notes, a "common way to satisfy this element is to demonstrate that the plaintiff performed substantially similar work as compared to similarly situated employees who were not members of a protected class but received lower compensation."  Def. Mem. at 42 (citing *Watson*, 235 F.3d at 857-58; *Lewis*, 2004 WL 765382, at *7).

Here Plaintiff offers the Court nothing but her own speculation that she was paid less than similarly situated employees outside her protected class; she does not identify any such employee or any evidence of any such pay disparity.  In fact, the only other Bloomberg employee whose compensation information is provided to the Court is Peal, a member of Plaintiff's protected race and gender classes who testified that she did in fact receive salary increases every year of her Bloomberg employment, as well as additional EECs.  *See* Peal Aff. ¶ 11.  In any event, Plaintiff has failed to show any circumstances that would give rise to an inference of discrimination.  *See*

*Nagle*, 513 F. Supp. 2d at 388 n.2; *Lewis*, 2004 WL 764382, at *7 (granting defendant summary judgment because "the mere fact that a white employee was paid more than a black employee, without evidence in the record to support the conclusion that the two employees were similarly situated or that they performed substantially the same work, is not sufficient to establish a prima facie case of wage discrimination").

With no evidence that she was paid less than another comparable employee or that any compensation disparity resulted from illegal discrimination, Plaintiff cannot meet Title VII or NJLAD's *prima facie* standard.  Without more, her discriminatory pay claim must fail.[38]

### 4.    **Wrongful Termination**

#### a.    *Prima Facie* Case

Finally, Plaintiff must establish a *prima facie* case of wrongful termination in order to survive Defendant's summary judgment attack on this claim.  To do so, she must demonstrate that she (1) is a member of a protected class; (2) was qualified for the position she held; (3) suffered an adverse employment action; and (4) "circumstances []give rise to an inference of unlawful discrimination such as might occur when the position is filled by a person not of the protected class."  *Jones*, 198 F.3d at 410-411 (affirming grant to defendant employer summary judgment on Title VII wrongful termination claim).[39]  The Court agrees with Defendant's

---

[38]In light of Plaintiff's failure to establish a *prima facie* case of wage discrimination, the Court need not reach Defendant's additional argument that Plaintiff cannot show that Bloomberg's legitimate reasons for its compensation decisions were a pretext for discrimination. *See Vernon*, 2010 WL 2089640 at *3.

[39]NJLAD calls for similar evidence, requiring that a plaintiff to show that her performance met her employer's legitimate expectations (second prong) and that she was replaced (fourth prong).  *See Clowes v. Terminix Int'l, Inc.* 538 A.2d 794, 805 (N.J. 1988) (affirming dismissal of wrongful termination claim).

contention that Plaintiff fails to satisfy the second or fourth prong.

*(i)      Qualifications for Position Held*

If an employee is unable to report to work to perform his required duties, he is simply not "qualified" for his position.  *See Santiago v. Temple Univ.*, 739 F. Supp. 974, 979 (E.D. Pa. 1990) ("An employee of any status, full or part time, cannot be qualified for his position is he is unable to attend the workplace to perform the required duties, because attendance is necessarily the fundamental prerequisite of job qualification.").  Importantly, this is true even where the individual is unable to report to the workplace due to a protected disability; under both the ADA and NJLAD, an employee ultimately must be able to physically attend to his job in order to considered "qualified" for it.  *See Shafnisky v. Bell Atl.,* Inc., No. 01-3044, 2002 WL 31513551, at *4 (E.D. Pa. Nov. 5, 2002) ("A person who is totally disabled and thus unable to perform in a job, even with an accommodation, is not a 'qualified individual' under the ADA.");  *Malone v. Aramark Servs., Inc.*, 760 A.2d 833, 836 (N.J. Super. Ct. Law Div. 2000) (under the NJLAD, "excessive absenteeism need not be accommodated even if it is caused by a disability otherwise protected by the Act.") (citing *Svarnas v. AT&T Commc'ns*, 740 A.2d 662, 674 (N.J. Super. Ct., App. Div. 1999).

There appears to be no dispute that Plaintiff was qualified for her multimedia producer position while still reporting for work and when she initially took disability leave.  However, once Plaintiff failed to return to the office for two months after her short-term disability benefits were set to expire, and more than one month after her doctor's note estimated that she would

return to work, she could no longer be considered "qualified" for her job.[40]  In addition, Plaintiff

did not meet Defendant's legitimate expectations when she failed to respond to Defendant's

attempts to contact her during her leave regarding her intention to apply for further leave or to

return to work.  *See Veltri v. Thompson Consumer Elec. Local No. 178*, No. 02-0645, 2004 WL

1490522, at *5 (M.D. Pa. May 18, 2004) (granting employer summary judgment where employee

was terminated after missing six consecutive shifts; plaintiff failed to established *prima facie*

*case* of discrimination under ADA because, in light of her absences from work, no reasonable

jury could find that plaintiff was qualified for her position).

### (ii)     Inference of Discrimination

The fourth prong of a *prima facie* case of wrongful termination requires a plaintiff to

demonstrate that similarly situated persons who are not members of her protected class were

treated more favorably than the plaintiff, or other circumstances of termination that give rise to

an inference of discrimination.  *See Hughes v. City of Bethlehem*, No. 05-5444, 2007 WL

954120, at *4 (E.D. Pa. Mar. 27, 2007) (citing *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797

(3d Cir. 2003).  To be considered "similarly situated," the comparator individual "must have

dealt with the same supervisor, have been subject to the same standards of employment, and have

engaged in the same conduct without such differentiating or mitigating circumstances that would

distinguish their conduct or the employer's treatment of them for it." *Hughes*, 2007 WL 954120

at *4 (internal citations omitted).

Defendant terminated Plaintiff after she failed to respond to its inquiries regarding her

---

[40]Indeed, in her EEOC Charge, Plaintiff stated that "[b]ecause she was *unable to return to work*, [her] attorney submitted a letter of resignation on [her] behalf on or about April 7, 2004." (EEOC Charge BLP 000038) (emphasis added).

intentions to remain on disability leave or to return to work and after Defendant received noticed from the PADOL that Plaintiff had applied for unemployment benefits. *See supra,* Section II.B. Plaintiff has offered no evidence of a similarly situated employee who was treated more favorably, or of a replacement for her position.[41]  As such, she cannot demonstrate any circumstances giving rise to an inference of discrimination relating to her termination. *See Killen v. Nw. Human Servs.*, No. 06-4100, 2007 WL 2684541, at *5 (E.D. Pa. Sept. 7, 2007) (plaintiff failed to make out *prima facie* case of wrongful termination where she could not show that similarly situated employees were not terminated); *Kenny v. Ultadent Prods., Inc.*, No. 05-1851, 2007 WL 2264851, at *6 (D.N.J. Aug. 6, 2007) (same where plaintiff was fired for not attending meeting and offered no evidence that non-protected employees failed to attend meeting but were not fired).

Plaintiff failed to return to work and refused to respond to Defendant's inquiries regarding her intention to do so, if any; she has not pointed out any similarly situated employee was treated more favorably, or replaced her in her position.  Her failure to demonstrate that she was qualified for her position at the time of her termination or to show any circumstances suggesting her termination was discriminatory are fatal to her *prima facie* claim of wrongful termination under Title VII, the ADA or NJLAD.[42]

---

[41]Plaintiff claims that "[o]ther similarly situated producers were not similarly fired, including Lauren (LNU), a white female who went out on disability leave and was not terminated, and Stephen Cwito, a white male."  Pl. Mem. at 17.  However, as discussed above, Plaintiff has not provided any evidence as to the identity of "Lauren (LNU)," and Bloomberg has no records of any employee named Stephen Cwito.  *See supra*, Section II.A., n.9.

[42]In addition to failing to meet the requirements for a *prima facie* case, Plaintiff elected to file her wrongful termination claim with the NJDCR, which (as with her failure-to-promote claim) foreclosed her ability to pursue it in court, other than to appeal the NJDCR's decision.

b.      <u>Constructive Termination</u>

The Court notes that Plaintiff's EEOC Charge indicates that her attorney submitted a letter of resignation on her behalf to Defendant prior to her actual termination by Defendant. (EEOC Charg BLP 000038.)  To the extent Plaintiff may argue that she was constructively terminated by Defendant's failure to accommodate her disability, this claim fails as well.  Under the ADA, an employer must make reasonable accommodations for an employee's known disability.  *Williams v. Phila. Housing Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004).  However, the employee has a duty "to assist in the search for appropriate reasonable accommodation and to act in good faith."  *Mengine v. Runyon*, 114 F.3d 415, 420 (3d Cir. 1997).  There is no evidence that Plaintiff fulfilled that duty here.

In *Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318 (3d Cir. 2003), the Third Circuit addressed very similar circumstances.  There the plaintiff took short-term leave after recurring tardiness relating to side effects of her medication, then returned to work on an altered work schedule offered by her employer to accommodate her disability.  *Id.*  at 321.  However, the plaintiff continued to arrive late to work.  *Id.* at 322.  When asked by a new company manager, who was unaware of the accommodation in place, if there were any reason why she could not resume her unaltered work schedule, Plaintiff did not mention the accommodation and instead agreed to return to the traditional schedule.  *Id.*  When she nonetheless continued to arrive late to work, the defendant terminated her employment.  *Id.* at 325.

_____

*See Hernandez*, 684 A.2d at 1390.  In light of this bar and the lack of a *prima facie* case, the Court need not reach Defendant's additional argument that Plaintiff cannot show that Bloomberg's legitimate reason for terminating her employment was a pretext for discrimination. *See Vernon*, 2010 WL 2089640 at *3.

The Third Circuit affirmed the district court's holding that the defendant employer did not violate the ADA, rejecting the plaintiff's argument that her defendant was at fault for withdrawing the previously granted accommodation. In the words of the appeals court, the defendant could not be held liable "for failing to read Conneen's tea leaves. Conneen had an obligation to truthfully communicate any need for an accommodation, or to have her doctor do so on her behalf if she was too embarrassed to respond to [the defendant's] many inquiries." *Id.* at 333. The Third Circuit noted that the plaintiff had previously asked for an accommodation and so was aware of what she needed to do in order to procure another. *Id.* The plaintiff was also aware that if her medical condition continued, she would need to provide further documentation to her employer in order to continue the accommodation; however, she failed to so. *Id.* Finally, the plaintiff failed to communicate with her employer regarding her need for further accommodation. *Id.*

Here Plaintiff had already sought and received a leave of absence from Bloomberg, so she knew what steps to take in order to do so again. She received notice that her short-term disability benefits were set to expire on March 2, 2004, and her completed leave forms indicated that she would return to work around March 30, 2004; Plaintiff was aware that she would need to submit additional documentation if she wanted to extend her leave (indeed, she had already begun her application for long-term disability benefits). Furthermore, she did not inform Defendant that she needed additional time; she failed to return Defendant's telephone calls and correspondence regarding that exact question.[43] Under these circumstances, Bloomberg was not required to "read

_____

[43]Plaintiff argues that in March 2004, her doctor provided CNA with his assessment that Plaintiff needed additional leave time and estimated a return date of June 2, 2004. *See supra*, Section II.B., n.22; Pl. Mem. at 18. However, as discussed, her doctor's unsigned report is

[Plaintiff's] tea leaves" either, and Plaintiff could not make out a constructive termination claim based on Defendant's failure to accommodate her disability.[44]

## B. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM

In addition to her discrimination claims, Plaintiff also brings a common law IIED claim. Under Pennsylvania law, a plaintiff may only prevail on an IIED claim if she can establish that the defendant behaved in a manner that "(1) is extreme and outrageous; (2) is intentional or reckless; and (3) causes severe emotional distress." *Smith v. Sch. Dist. of Phila.*, 112 F. Supp. 2d 417, 427 (E.D. Pa. 2000). To meet that standard, "'[t]he conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1998) (quoting *Buczek v. First Nat'l Bank of Mifflintown*, 531

---

marked as a draft version only, with no indication that it was indeed submitted to CNA and without necessary supporting documentation. *See supra*, Section II.B., n.22. As of April 9, 2004, CNA indicated to Bloomberg that it still had not received the requested information from Plaintiff (Marron Letter BLP 000014), and Plaintiff still had not responded to Defendant's interim inquiries.

[44]If Plaintiff were to suggest that Defendant should have granted her an indefinite leave of absence, this position too would be misplaced. Under the ADA, a leave of absence for an indefinite period of time is not reasonable. *See Fogleman v. Greater Hazleton Health Alliance*, 122 F. App'x 581, 585 (3d Cir. 2004); *Davidson v. Atlantic City Police Dep't*, No. 96-3884, 1999 WL 533698, at *6 (D.N.J. June 28, 1999) (a "reasonable accommodation" is one "that will enable the disabled employee to perform the essential function of his job in the present or the *predictable near future*, not at some uncertain future date") (emphasis added). Plaintiff's disability forms indicated that her leave was to end "TBD," with a duration of six to 12 months and an estimated return date of March 30, 2004. (November 2003 FMLA Form BLP 000136; October 2003 FMLA Form BLP 000027; September 2003 FMLA Form BLP 000004.) Her short-term disability benefits were scheduled to expire March 2, 2004. (Asman Aff. ¶ 5; April 2004 Gibbons Email BLP 000321; January 2004 Sack Email BLP 000107; Gibbons Note BLP 000112; February 2004 Gibbons Letter BLP 000094; Cubbage Dep. 305; 309-10.) Plaintiff failed to respond to Defendant's inquiries as to her return; Bloomberg was not required to "assume" that she needed more time. (Cubbage Dep. at 246-47.)

A.2d 1122, 1125 (Pa. Super. 1987)).  This is an extremely high bar; not surprisingly, this district

has interpreted what constitutes "extreme and dangerous" narrowly in most instances. Indeed, "it

is extremely rare to find conduct in the employment context that will rise to the level of

outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of

emotional distress."  *Cox*, 861 F.2d at 395; *see, e.g., Coney v. Pepsi Cola Bottling Co.*, No. 97-

2419, 1997 WL 299434, at *1 (E.D. Pa. May 29, 1997) ("[H]ighly provocative racial slurs and

other discriminatory incidents do not amount to actionable outrageous conduct.").

Plaintiff's allegations do not come close to meeting the IIED standard.  Multiple

telephone calls[45] and form completion requests hardly constitute "extreme and outrageous

conduct."  Indeed, Plaintiff cites only two cases in support of her position, both of which

dismissed the IIED claims at issue.  *See* Pl. Mem. at 20 (citing *Fanelle v. LoJack Corp.*, 79 F.

Supp. 2d 558 (E.D. Pa.) (granting motion to dismiss on IIED claim); *Parker v. DPCE, Inc.*, No.

91-4829, 1992 WL 501273 (E.D. Pa. Nov. 3, 1992) (granting motion to dismiss on IIED claim

where racial slurs, assault and termination in employment context were "completely

reprehensible," "inconsiderate," and "unwarranted," but did not rise to the level of

outrageousness required)).  Even if this Court had found in favor of Plaintiff on her

discrimination claims, that still would not be enough to sustain her IIED claim here.  *See, e.g.,*

*EEOC v. Chestnut Hill Hosp.*, 874 F. Supp. 92, 96 (E.D. Pa.1995) (racial discrimination in

---

[45]Plaintiff argues that her IIED claim arises from Defendant calling Plaintiff "30 times"
and requiring her to "complete the same [disability] forms over 10 times."  Pl. Mem. at 20.
However, Plaintiff has presented no evidence that Defendant called her 30 times, nor that she
was required to revise her disability forms more than three times.  *See supra*, Section II.B., n.18.

employment decision insufficient to sustain claim).[46]

## V.    **CONCLUSION**

For the foregoing reasons, summary judgment will be granted in favor of Bloomberg and

against Plaintiff. An appropriate Order follows.

---

[46]Defendant does not raise the argument that the Pennsylvania Workmen's Compensation Act ("WCA") bars Plaintiff's IIED claim under the "third party attack exception." *See Parker*, 1992 WL 510273 at *12 (WCA barred IIED claim where alleged racial epithets, assault and termination were made within context of his employment, not motivated by personal animosity against plaintiff).  As such, and in light of Plaintiff's failure to establish that Defendant's conduct rises to the requisite level of outrageousness, the Court need not address the question.